UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

NORMAN W. JAHN,                              Case No.   2:22-cv-00233

        Plaintiff,                          Hon. Paul L. Maloney
                                            U.S. District Judge

    v.

BAY MILLS COMMUNITY COLLEGE,

        Defendant.
_____/

## REPORT AND RECOMMENDATION

### I.  Introduction

This Report and Recommendation (R&R) addresses a motion to dismiss filed by Defendant Bay Mills Community College (BMCC or "the college").   (ECF No. 9.)

Plaintiff Norman W. Jahn filed this cause of action against BMCC for discrimination and retaliation arising out of the termination of his employment with the college.   Defendant BMCC filed a motion to dismiss in which it argued that Jahn's complaint fails to state a claim upon which relief may be granted and that Jahn failed to exhaust his claims before the Equal Employment Opportunity Commission (EEOC) before filing his civil complaint with this court.

Jahn's complaint essentially asserts that BMCC retaliated against him after he made numerous complaints of financial aid fraud, particularly regarding the Pell Grant eligibility of students.   Jahn says that despite his numerous complaints, no one at the college seemed concerned about his allegations of fraud.   Instead, he says he was harassed, disciplined, and ultimately terminated from his employment.

Jahn also alleges that his termination was due to race, gender, and age discrimination in addition to retaliation.

The undersigned is sympathetic to Jahn's unfortunate circumstances. But, based on the record before the Court, the undersigned respectfully recommends dismissal of this case. As a starting point, Jahn's complaint fails to assert facts that could support race, gender, and age discrimination claims under federal law. Jahn merely alleged the fact of discrimination and did not support his discrimination claims with factual allegations. In addition, Jahn failed to exhaust his race and gender discrimination claims by bringing race and gender charges before the EEOC. Jahn further failed to allege a Title VII retaliation claim because his complaint fails to allege conduct that is protected under Title VII. Accordingly, the undersigned respectfully recommends that the Court dismiss Jahn's federal claims and decline to exercise supplemental jurisdiction over Jahn's state law cause of actions.

## II.   Factual Allegations

The statement of facts portion of Jahn's complaint spans some 28 pages, most of which are single-spaced. (ECF No. 1, PageID.10-37.) Jahn alleges that he was an instructor at BMCC from 2015 to 2017. (*Id.*, PageID10.) He states that he retired from law enforcement after a twenty-five-year career. (*Id.*) Jahn says that he accepted the position of Academic Success Coach with the BMCC after receiving an offer from the TRIO Director.[1] (*Id.*, PageID.11.) Jahn began working in his new

---

[1]      The Federal TRIO program (named for three programs: Upward Bound, Talent Search, and Student Support Services) is designed to provide services to students from disadvantaged backgrounds.

2

position on August 27, 2016.    (*Id.*)    Jahn continued in that position until his termination on February 14, 2022.    (*Id.*)    Jahn says that he received positive feedback from his supervisor and co-workers, raises, and additional responsibilities throughout his employment with BMCC.    (*Id.*)

Jahn says that although he received training regarding the applicability of the Family Educational Rights and Privacy Act (FERPA), 20 U.S.C. § 1232g, he did not receive "training specific to authorizations or restrictions on accessing or disclosing of student information acquired through various programs or databases used at BMCC."    (*Id.*, PageID12.)    Jahn says that his complaints regarding "lack of guidance to the attention of management" were deflected.    (*Id.*)    Jahn says that employees in other departments were "weaponizing FERPA" as a form of "bullying." (*Id.*, PageID.13.)    Jahn states that he could access FERPA materials because he had a legitimate educational interest.    (*Id.*)    Jahn says that he never received a directive to stop using databases or accessing FERPA materials and was never disciplined until November 11, 2021.    (*Id.*)    Jahn alleges that BMCC revised FERPA policies twice, first on November 19, 2021, and then on March 18, 2022.    (*Id.*)

Jahn explains that most students at BMCC receive Pell Grants that do not need to be repaid.    (*Id.*)    Jahn says that Pell Grants are based on income and the program is administered by the Office of Federal Student Aid (FSA).    (*Id.*)    Jahn says that half the students are provided free tuition through the Board of Regents Tuition Award.    (*Id.*)    Jahn asserts that a student receiving the maximum amount

---

https://www2.ed.gov/about/offices/list/ope/trio/index. html (last visited July 3, 2023).

of Pell Grant money receives more than they will need for tuition, fees, and books at BMCC.  (*Id.*)  Jahn says that students are instructed that they need to refund the amounts of their Pell Grant that exceeds their educational expenses.  (Id.)  Jahn believes that BMCC was reviewed by the FSA in 2020, "because payments were being made to students in ineligible programs or for taking classes not in their approved program of study."  (*Id.*, PageID.14.)  Jahn says that BMCC is required to repay funds provided to students in ineligible programs.  (*Id.*)

Jahn says he noticed the "irregularities in financial aid" and informed his supervisor.  (*Id.*)  Jahn asserts he questioned whether the college was following FSA regulations on "numerous occasions."  (*Id.*)  For example, Jahn says that a student may use Pell Grant money for an associate degree program in Criminal Justice, but not to obtain a certificate in criminal justice.  (*Id.*)  Jahn says that when it was obvious that students were using Pell Grants to only obtain certificates, the college would "look the other way" and fail to monitor the classes that students elected to take.  (*Id.*)  Jahn says that Pell Grants at the college were awarded to students inconsistently.  (*Id.*)  Jahn contends that some students received Pell Grants while working toward certificates while others did not.  (*Id.*)

Jahn made numerous complaints because he felt that these practices were wrong.  (*Id.*, PageID.15.)  Jahn says that some staff mistakenly believed that they should not tell students which classes to take.  (*Id.*)  Jahn says that he took it upon himself to try to create policy language for the college.  (*Id.*, PageID.16.)  Jahn

further wrote that he was unsure if the financial aid staff and others employed at BMCC understood the requirements.  (*Id.*)

In September of 2018, Jahn questioned whether placing students in the criminal justice associate degree program simply to allow them to qualify for a Pell Grant was a good practice, and he suggested that BMCC seek approval for Pell Grant money for certificate programs.  (*Id.*)  Jahn continued to question whether BMCC should allow students to use Pell Grants when they only intended to obtain a certificate.  (*Id.*, PageID.17.)

Jahn states that BMCC receives funding from the Bureau of Indian Education, and students receive financial aid or scholarships from different sources.  (*Id.*)  Jahn says that there exists a financial incentive to increase tribal member enrollment because BMCC "nets" approximately $2,500 for each tribal student who takes at least 12 credits.  (*Id.*, PageID.18.)

Jahn asserts that it is well known that BMCC has a dysfunctional and hostile work environment.  (*Id.*)  To support this claim, Jahn cites to opening remarks from a meeting conducted by former BMCC President Michael Parish on February 1, 2017, where he stated that if staff was more concerned about protecting their departments than helping students, or not embracing new ideas that could improve services, then "they should get out of the way and let somebody else do it."  (*Id.*)  Jahn cites other examples from meetings and memoranda he received between March 1, 2017, and September 22, 2020, to support his assertion that BMCC was dysfunctional and had a hostile work environment.  (*Id.*, PageID.19-20.)

Jahn then states that "[t]he TRIO program was the focus of significant animosity." (*Id.*, PageID.20.) BMCC "however, kept renewing and accepting approximately $250,000 per year." (*Id.*) The supervisor who hired Jahn resigned on February 15, 2020. (*Id.*, PageID.21.) On February 27, 2020, it was announced that TRIO Academic Success Coaches would now assist with new student registrations. (*Id.*) Jahn complains that this was a new job duty that was never added to his official job description. (*Id.*) He received access from the Registrar to the students' records database. (*Id.*) Jahn says that he expressed his concerns regarding BMCC's definition of good standing. (*Id.*, PageID.22.)

On July 31, 2020, Duane Bell was selected as the new President of BMCC. (*Id.*) Wendy Heyrman was initially promoted to TRIO Director and then she was promoted to Vice President of Student Services. (*Id.*) Tenniel McLeod was promoted to TRIO Director and a male tribal member was hired as her replacement. (*Id.*)

Jahn alleges that as of October 29, 2020, his role included student advising with expanded access to student records. (*Id.*) Jahn was told by someone from the financial aid department on March 3, 2021, that students would be asked to repay financial aid if they withdrew from 60 percent of their classes before the end of the semester. (*Id.*)

Jahn says that on March 20, 2021, President Bedell told him that he did a great job analyzing "what population of our student body successfully completes or does not successfully complete courses in which they enroll." (*Id.*, PageID.23.)

Jahn says that this report required him to access student records for students not specifically assigned to him.  (*Id.*)    On June 1, 2021, Jahn says that he received praise for locating students who had received refund checks but had not yet cashed them.  (*Id.*)

On October 28, 2021, Jahn received an assignment to contact a new student. Jahn recognized the name because another student shared the same name.  (*Id.*, PageID.23.)   Both students had low grade point averages that made them ineligible for future Pell Grant awards.  (*Id.*)   In November of 2021, Jahn was informed by the student that he did not need assistance from him because his brother, a former student, was advising him.  (*Id.*, PageID.24.)    Jahn contacted Financial Aid Specialist Cobiere due to his concerns involving the two students with the same last name.  (*Id.*)   He discussed his concerns that FSA regulations concerning Pell Grants were being violated and that several students appeared to accept aid but not attend their classes.  (*Id.*)   Jahn says that he learned that BMCC was required to repay Pell several thousand dollars for the Fall of 2021, because of non-attendance and low grades.  (*Id.*)   Jahn also says that he was aware of a practice known as "Pell running" where students enrolled in classes with low tuition and stopped attending after receiving financial aid.  (*Id.*)   Students would also move to another college when they were no longer eligible for Pell Grants at one college.   (*Id.*)

Jahn says that he immediately wrote his supervisors and raised concerns about "red flags" and financial aid.  (*Id.*)   Jahn says that he pointed out that students are enrolled in the criminal justice associate degree program instead of just

seeking the corrections certificate of completion.    (*Id.*)    Jahn was concerned that it appeared that students pursuing a certificate were being enrolled by the college into the associate degree program only to make them Pell Grant eligible.    (*Id.*)

Jahn says that Financial Aid Specialist Corbier complained to Supervisor McLeod that Jahn was making insinuations about students.    (*Id.*, PageID.25.) Jahn says that it was alleged that he violated FERPA by sharing student records with his supervisors.    (*Id.*)    Supervisor McLeod cautioned Jahn about "accessing financials."    (*Id.*)    Jahn received a written reprimand on November 11, 2021.    (*Id.*) Jahn says that he signed the form but noted his disagreement.    (*Id.*)    Jahn says he never received an interview or an opportunity to respond (*Id.*)

On November 12, 2021, Jahn was assigned to take three students on a transfer trip to Northern Michigan University.    (*Id.*, PageID.27.)    Jahn had concerns about the students' tardiness, and his belief that two students may have been hung-over. (*Id.*)    He notified his supervisors in a detailed report so that the two students could be questioned about their drinking during the trip, but Jahn learned that his supervisors never conducted an interview with the students in question.    (*Id.*) Jahn waited to discuss this incident with his supervisors, but Supervisor McLeod never discussed his report.    (*Id.*)    Jahn's report of the incident was first addressed on December 9, 2021, by Vice President Heyrman.    (*Id.*)

On December 8, 2021, Jahn mistakenly sent a list of his notes to Vice President Heyrman regarding topics that he wished to discuss.    (*Id.*)    After Vice President Heyrman received the list, the Vice President set up a meeting with Jahn by email.

(*Id.*)   Jahn did not see the email, and when Vice President Heyrman stopped by Jahn's office just before the meeting, Jahn told Vice President Heyrman that he was concerned about Supervisor McLeod "getting overly involved with a student" and thought it should be discussed for her own good.   (*Id.*)   Then Jahn told Vice President Heyrman that he did not ask to meet with President Bedell, and that he did not have time for a meeting on such short notice.   (*Id.*)   Jahn perceived that Vice President Heyrman was agitated.   (*Id.*, PageID.27-28.)   Vice President Heyrman referring to the students on the transfer trip stated, "you said you have no evidence of student drinking."   (*Id.*, PageID.28.)   Then Vice President Heyrman stated she needed to check with HR about the traffic ticket that Jahn received during the transfer the trip.   (*Id.*)   Jahn was upset that Vice President Heyrman and Supervisor McLeod ignored his report, and that Vice President Heyrman seemed concerned about Jahn's traffic ticket.   (*Id.*)

Jahn sent President Bedell an email.   (*Id.*)   In the email Jahn stated that he believed he was being targeted and treated unprofessionally.   (*Id.*)   Jahn requested time off for the rest of the day and the next day, which was approved by Supervisor McLeod.   (*Id.*)   Jahn then requested the next week off and decided not to attend the "Christmas Party."   (*Id.*)   Jahn was "frustrated and upset about the tone of the visit" so he left his office and walked to another area in the building to sit down and make "contemporaneous notes on the situation."   (*Id.*)   While making his notes, President Bedell walked by Jahn, but did not stop.   (*Id.*)   Jahn says that it is

unknown to him whether President Bedell was aware of the meeting and whether he had read Jahn's email.   (*Id.*)

On December 12, 2021, Jahn wrote President Bedell to explain the incident regarding the meeting.   (*Id.*)   Jahn further explained, "I believe there may be academic fraud and financial aid fraud occurring . . . and I am upsetting my supervisors for addressing this."   (ECF No. 1, PageID.28-29.)   Jahn indicated "that he intended to report himself to the Inspector General for the Department of Education for analysis and clarification of the alleged FERPA violation."   (*Id.*, PageID.29.)   Jahn informed President Bedell that Supervisor McLeod was permitted to not communicate with her previous supervisor for weeks at a time.   (*Id.*)   President Bedell scheduled a meeting for the next day.   (*Id.*)

Jahn sent an email to President Bedell outlining what he hoped to discuss at the meeting.   (*Id.*)   During the meeting several topics were discussed including Jahn's concerns regarding student aid and Pell Grant fraud.   (*Id.*)   Jahn says that no one told him that he was under investigation for failing to participate in the December 9 meeting and he did not hear about alleged "insubordination" until two months later.   (*Id.*)   Jahn discussed "that he was hoping for an '*orderly outplacement*' and was looking for other employment."   (*Id.*)

Jahn says that he received a five-day suspension due to his decision not to participate in the December 9 meeting.   (*Id.*)   Paperwork was completed that included his suspension and termination for being insubordinate on December 8.

(*Id.*, PageID.29-30.)    Jahn says that there was no meeting on December 8.    (*Id.*, PageID.30.)

Jahn says that he was instructed to no longer assist students who were not active in TRIO, and he expressed his frustration to Human Resource Director Walden in an email on January 4, 2022.    (*Id.*)    On January 7, 2022, Jahn says that he wrote to Director Walden about actions Supervisor McLeod had taken against him, including removing students from his responsibility, being told not to assist inexperienced faculty members with advising, being harassed for missing a "TEAMS call" by 7 minutes, and the requirement to share his calendar.    (*Id.*, PageID.30-31.)

On January 9, 2022, Jahn says that he "shared a summary of all fall semester grades with Bedell."    (*Id.*, PageID.31.)    Jahn also asked Waldon to inquire whether there had been a legal opinion about the issues he reported regarding financial aid and Pell Grant fraud, deceptive registration practices, non-eligible programs, and restrictions on self-advising.    (*Id.*)    Jahn also "asserted that his written reprimand was invalid" and that he had reported himself to FERPA.    (*Id.*)

On January 10, 2022, Jahn received an email from President Bedell addressing Jahn's frustration and unhappiness with his job at BMCC, and Jahn's request for a formal investigation of a student.    (*Id.*)    President Bedell set up a meeting with Jahn to discuss "how unhappy you are here."    (*Id.*)    Jahn says that he was perplexed because he never had complained about his unhappiness with President Bedell.    (*Id.*, PageID.32.)

In preparation for the meeting, Jahn says that he drove to BMCC and delivered two packages of information to President Bedell that "consisted of a detailed refutation of the claims made by Plaintiff's supervisor regarding several topics." (*Id.*)   During the January 14, 2022 meeting, Jahn expressed his opinion that BMCC was operating more as a social program than an academic institution.   (*Id.*)   They also discussed Jahn's November 3, 2021, written reprimand.   (*Id.*)   Jahn told President Bedell that he could not give him a separation date due to his diagnosis of possible cancer until he received his MRI on January 25, 2022.   (*Id.*)   Jahn told President Bedell that some employees used FERPA as a weapon to target him.   (*Id.*) Jahn says that President Bedell was working on "succession planning" and "was speaking with older, long-term employees about their future plans."   (*Id.*)

On February 7, 2022, Jahn emailed President Bedell "a story on financial aid fraud" involving fake students receiving financial aid refunds.   (*Id.*)   President Bedell replied, "thank you," and noted that staff attended training on fraud at the time pandemic relief funds were being processed.   (*Id.*)   President Bedell also asked Jahn if he had come up with a "timeline yet" based upon his comment the last time they had spoken. (*Id.*)   Jahn says that he told President Bedell "that he did not intend to remain employed at BMCC due to the unfair treatment he was receiving and the toxic work environment."   (*Id.*)   Jahn responded with a chronology of events and "reminded" President Bedell that it was not prudent for him due to his medical issues to voluntarily leave BMCC and lose his health insurance.   (*Id.*)   Jahn informed President Bedell of his plan to use leave time, disability leave, FMLA, and

12

leave without pay.   (*Id.*)   Jahn informed President Bedell that he would continue to do his job and continue to "ask questions and express concerns just like he did on November 3, 2021, leading to a disputed written reprimand."   (*Id.*)

On February 8, 2022, Jahn informed President Bedell that McLeod did not want to receive any more emails regarding financial aid fraud.   (*Id.*)   Jahn indicated that he felt his supervisors were harassing him and retaliating against him because he had objected "to the invalid FERPA discipline."   (*Id.*)

On February 10, 2022, McLeod notified Jahn that she was taking away an "assigned student" from his advising responsibility.   (*Id.*)   Jahn responded that his concerns about financial aid fraud resulted in false disciplinary action against him for a FERPA violation.   (*Id.*)   Jahn indicated that when his concerns are denied or ignored, and he is prohibited from further communicating about "news and current events – which clearly pertain to the job – this looks like retaliation and I'll seek whistleblower protection."   (*Id.*, PageID.34.)

Jahn states that he was called to President Bedell's office on February 10, 2022.   (*Id.*)   Both Heyrman and McLeod were present and "making statements and interrupting."   (*Id.*)   The meeting was "accusatory" and "deteriorated rapidly." (*Id.*)   Jahn says that he was not allowed to record the meeting.   (*Id.*)   At one point during the meeting, McLeod stated that "Nobody around her likes you or wants to work with you."   (*Id.*)   Jahn says that he knew he was not accepted because he was not Native American.   (*Id.*)   Student Affairs consisted of 15 female Native American employees.   (*Id.*)   Jahn "made it known that he would be contacting the Office of

13

Inspector General." (*Id.*)  Jahn further "reminded" President Bedell that BMCC would have to pay back thousands of dollars in Pell Grant money, and Bedell responded that "it happens." (*Id.*)

Later that day, Jahn wrote President Bedell and requested to use his remaining leave time. (*Id.*)  He acknowledged that he was an at-will employee but believed that he was a victim of discrimination based upon his gender, age, and ethnicity and a target for retaliation because he reported FERPA matters. (*Id.*) Jahn further explained "I've already tolerated way too much toxicity and unprofessional conduct in the workplace." (*Id.*, PageID.35.)  Jahn says that his request for ten days off was initially approved, but then he received an immediate five-day suspension. (*Id.*)  Vice President Heyrman authored a memorandum on February 10, 2022, that explained the reasoning for Jahn's suspension:

> *(2) The following conduct is prohibited and individuals engaged in it will be subject to discipline, up to and including termination (see DISCIPLINARY PROCEDURE, Policy 300.808):*
>
>> *(h) Refusing to follow management's instructions concerning a job-related matter or being insubordinate;*
>
> The specific incidents in which your behavior was not in compliance include:
>
> - On November 11, 2021 in a meeting with Tenniel McLeod and myself, when your supervisor attempted to give you direction, you stated "Look at you, trying to be assertive…." You also said "should I ignore you for months?"

- On December 08, 2021, you requested a meeting, which I as your supervisor\department head arranged for December 9th at 10:00am. You refused to attend the meeting. This is insubordination.

- On January 7, 2022, you refused to participate in Teams communications after your supervisor Tenniel McLeod sent an email asking you to be sure your teams was on. You replied that BMCC has no remote policy and that you prefer to use email and would use teams if it was an appointment.

- On February 10, 2022, during a meeting with Duane Bedell, Tenniel McLeod, and myself you were confrontational, unprofessional, and discourteous. Further, you dismissed a specific instruction\directive I gave you by waving at me and saying "whatever". You also referred to a coworker as "a little bully" and refused to listen when I was explaining her concern to you. This is a refusal to follow management instructions and it was insubordinate.

As a result of these incidents, you are being issued a written reprimand which will be placed in your file.

You are being placed on suspension without pay that will begin on February 11, 2022 at 8 a.m. and end on February 17, 2022 at 4:30 p.m., with your return to work at 8 a.m. on February 18, 2022. Further, any future instances of poor behavior or conduct that is not in BMCC's best interest will result in a final reprimand and termination.

(ECF No. 1-4, PageID.52-53.)

On February 14, 2022, President Bedell notified Jahn that his employment was terminated effective that day.  (*Id.*)  Jahn says that he is aware of other similarly situated employees who did not receive discipline or termination at BMCC. (*Id.*)  President Bedell wrote:

Norm,

Upon review of the written disciplinary action dated February 10, 2022, it is determined insubordination took place on December 8, 2021, and on February 10, 2022, which are violations of BMCC Personnel Policy 300.801 (2)(h). Not only will the written reprimand stay in your record, your employment with BMCC will end today, February 14, 2022. Pursuant to BMCC's Dispute Resolution Procedure (300.904), this is the final written and binding decision.

Please contact Craig Carrick to make an appointment to remove your personal items from the office assigned to you not later than February 18, 2022. Further, you are required to turn in any keys, BMCC owned phones, the Microsoft Surface laptop and accessories, and any other assets that have been assigned to you. You are not required to return the Jabra headphones.

You will be paid for your remaining vacation and personal leave time. A review of the records show you have a balance of 61 vacation hours and 27 personal hours as of February 14, 2022. These amounts will be paid out in your final paycheck, which you can expect on February 17, 2022.

The benefit package will be terminated effective February 14, 2022, at 11:59 p.m. That includes health insurance, life & disability insurance, and retirement contributions. You will receive correspondence regarding the continuance of your health insurance and life insurance. For questions regarding your retirement account, please contact TIAA-Cref at 800-842-2252.

Cordially,

Duane A. Bedell
President

(ECF No. 1-3, PageID.49.)

Jahn asserts five counts in his complaint. Three of the counts arise under federal law. Those are gender discrimination under 42 U.S.C. § 2000e *et seq*. (Count I), retaliation under 42 U.S.C. § 2000e *et seq*. (Count II), and race discrimination under 42 U.S.C. § 1981 (Count III). (*Id.*, PageID.37-38.) The two remaining counts arise under state law. Those are gender discrimination under Michigan's Elliot-

16

Larsen Civil Rights Act (ELCRA), Mich. Comp. Laws § 37.2102 *et seq* (Count IV), and retaliation and failure to hire under ELCRA (Count V).   (*Id.*, PageID.38-39.)

### III.   Motion to Dismiss Standard

Defendant moves to dismiss Plaintiff's complaint for failure to state a claim upon which relief may be granted.   A pleading filed by a *pro se* Plaintiff is subject to less stringent standards than a pleading prepared by an attorney.   *Estelle v. Gamble*, 429 U.S. 97 (1976); *Haines v. Kerner*, 404 U.S. 519 (1972).   "A pleading that states a claim for relief must contain" among other things, "a short and plain statement of the claim showing that the pleader is entitled to relief."   Fed. R. Civ. P. 8(a), (a)(2).  "Each allegation must be simple, concise, and direct."   Fed. R. Civ. P. 8(d)(1).   A plaintiff must plead a claim with clarity and provide a defendant with fair notice of the claim and grounds upon which it rests.   *Kensu v. Corizon, Inc.*, 5 Fed.4th, 646, 650 (6th Cir. 2021).   "The district court and defendants should not have to 'fish a gold coin from a bucket of mud' to identify the allegations really at issue."   *Id.* at 651 (citation omitted).

The Federal Rules provide that a claim may be dismissed for "failure to state a claim upon which relief can be granted."   Fed. R. Civ. P. 12(b)(6).   To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face."   *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted).   Put differently, if plaintiffs do "not nudge[] their claims across the line from conceivable to plausible, their complaint must be dismissed."   *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

In determining whether a claim has facial plausibility, a court must construe the complaint in the light most favorable to the plaintiff, accept the factual allegations as true, and draw all reasonable inferences in favor of the plaintiff. *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008). Those factual allegations "must contain either direct or inferential allegations respecting all the material elements to sustain recovery under some viable legal theory." *League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007) (internal citations omitted). "When a court is presented with a Rule 12(b)(6) motion, it may consider the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion so long as they are referred to in the Complaint and are central to the claims contained therein." *Id.*

## IV.   Gender (Count I), Race (Count III), and Age Discrimination

Title VII makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."   42 U.S.C. § 2000e-2(a)(1).   But Section 2000e-2 "does not include age or disability claims."   *Clark v. City of Dublin, Ohio*, 178 F. App'x 522, 524 (6th Cir. 2006).

In Count I of his complaint, Jahn asserts that Defendant discriminated against him because he is a male, and, in Count III, Jahn asserts that Defendant discriminated against him because he is not Native American.   Jahn did not assert a count based upon age discrimination, but it appears that he intends to bring an age discrimination claim.   (ECF No. 1, PageID.37, ¶ 102.)   Jahn alleged in his complaint that he is a 62-year-old white male (*id.*, PageID.9), discriminated against "based on his age" (*id.*, PageID.37).

A plaintiff does not need to allege detailed factual allegations to state a claim upon which relief may be granted, but the complaint "must allege sufficient 'factual content' from which a court, informed by its 'judicial experience and common sense,' could draw the reasonable inference that Defendants discriminated against Plaintiff with respect to his race and gender."   *Han v. University of Dayton*, 541 F. App'x. 622, 626 (6th Cir. 2013).   A plaintiff must allege more than "bare conclusory assertions" of discrimination in his complaint.   *Id.*

Jahn alleges in his complaint that he was treated unfairly and harassed. Throughout his detailed complaint, Jahn alleges that he was unfairly disciplined for a FERPA violation after he made complaints of ongoing financial aid fraud relating to Pell Grants that students received despite being ineligible to receive the grants because they were pursuing a certificate and not an associate degree.   For example, Jahn alleges that BMCC staff directed students to the criminal justice associate degree program so they could be eligible for a Pell Grant although the students intended to only pursue a criminal justice certificate.

19

Jahn also outlined his ongoing pursuit to bring these matters to the attention of his supervisors and President Bedell.   Jahn's complaint asserts that he was treated unfairly and ultimately discharged because he continued to bring his concerns regarding financial aid fraud to his superiors, and they did not want to discuss or investigate his concerns.   Jahn first raised the possibility that he was being discriminated against because he was a white male during the February 10, 2022, meeting he had with President Bedell, Vice President Heyrman, and Supervisor McLeod.   (*Id.*, PageID.34.)   Jahn alleges that:

> The meeting was out of control and McLeod said, at one point, "*Nobody around here likes you or wants to work with you*" This was quite a departure from just a few months earlier when she praised Plaintiff for being so easy to work with.   Plaintiff knew he was not accepted by some employees because he was not Native American.

*Id.*

Later that day, Jahn expressed his frustrations to President Bedell in an email. Jahn says that he wrote:

> *Nothing will change what I learned in person today from my supervisors and I have every reason to believe I am the victim of discrimination based on gender, age, and ethnicity and that I am now targeted for retaliation because I made some people uncomfortable with what I have reported regarding FERPA and other matters.*

*Id.*

Finally, during the January 14, 2022, meeting that President Bedell had set up with Jahn to discuss how unhappy Jahn was at BMCC, Jahn says that President Bedell told him that "he was working on '*succession planning*' and how he had been

speaking with older, long-term employees about their future plans." (*Id.*, PageID.31-32.)

These are Jahn's only allegations of discrimination.  Jahn never identified the employees who did not accept him because he was not Native American, and he never indicated whether any of these employees had supervisory authority over him or had any involvement in imposing discipline against him or in terminating his employment with BMCC.  Although Jahn stated that he "believed" he was being discriminated against, he failed to allege any facts that could support a claim of discrimination based upon his age, gender, and race.  At best, Jahn's allegations assert that President Bedell was discussing with older employees their future for succession planning purposes.  This allegation alone is insufficient to establish a plausible age discrimination claim, especially since Jahn had already told President Bedell that he did not intend to remain employed at BMCC.  Jahn's complaint simply asserts the fact of discrimination but contains no facts which could arguably support discrimination.  The mere fact that Jahn was a 62-year-old white male at the time he filed his complaint and not a Native American female, is insufficient to support the allegation that his termination was due to his gender, race, or age.   In the opinion of the undersigned, Jahn's discrimination allegations – Counts 1 and 3 – fail to state claims of relief based upon race, gender, or age discrimination.

**V.  Exhaustion of Race and Gender Discrimination Claims**

Defendant's Rule 12(b)(6) motion (ECF No. 9) also asks the Court to dismiss the gender and race discrimination claims in Jahn's complaint due his alleged failure

to exhaust those claims in a complaint to the EEOC.   Jahn's response (ECF No. 12) includes a number of additional records.   The undersigned will analyze Defendant's motion under the motions to dismiss standard set forth above and will recommend dismissal on that basis.

Title VII requires a person alleging a violation to file a charge with the Equal Employment Opportunity Commission (EEOC). 42 U.S.C. § 2000e-5(e)(1).   "As a general rule, a Title VII plaintiff cannot bring claims in a lawsuit that were not included in his EEOC charge."   *Younis v. Pinnacle Airlines, Inc.*, 610 F.3d 359, 361 (6th Cir. 2010).

> Congress gave the EEOC initial enforcement responsibility for employment discrimination claims brought under Title VII. *Younis v. Pinnacle Airlines, Inc.*, 610 F.3d 359, 361 (6th Cir. 2010). Accordingly, a plaintiff must first file an administrative charge with the EEOC within a certain time that alleges the wrongful conduct. *Id.* "The charge must be 'sufficiently precise to identify the parties, and to describe generally the action or practices complained of.' " *Id.* (quoting 29 C.F.R. § 1601.12(b) ). A plaintiff must exhaust administrative remedies before filing suit in federal court. *Id.* at 362. To properly exhaust, a plaintiff must: "(1) timely file a charge of employment discrimination with the EEOC; and (2) receive and act upon the EEOC's statutory notice of the right to sue ('right-to-sue letter')." *Granderson v. Univ. of Michigan*, 211 Fed.Appx. 398, 400 (6th Cir. 2006).

*Peeples v. City of Detroit*, 891 F.3d 622, 630 (6th Cir. 2018).

The EEOC's "investigatory and conciliatory procedures notify potential defendants of the nature of plaintiffs' claims and provide them the opportunity to settle the claims before the EEOC rather than litigate them."   *Davis v. Sodexho, Cumberland Coll. Cafeteria*, 157 F.3d 460, 463 (6th Cir. 1998).   But, "allowing a Title

VII action to encompass claims outside the reach of the EEOC charges would deprive the charged party of notice and would frustrate the EEOC's investigatory and conciliatory role." *Younis*, 610 F.3d at 362.   Nevertheless, *pro se* complaints to the EEOC are construed liberally, and courts "may also consider claims that are reasonably related to or grow out of the factual allegations in the EEOC charge." *Id*. But even *pro se* plaintiffs are required to meet the requirements of the law. *Granderson v. University of Michigan*, 211 F. App'x 398 (6th Cir. 2006) (dismissing Title VII race discrimination claim because plaintiff failed to file a timely EEOC charge raising race discrimination)).

A review of the documents provided by Jahn with his complaint demonstrates that he presented a charge of discrimination to the Michigan Department of Civil Rights and the EEOC on August 23, 2022.[2]   (ECF No. 1-2, PageID.47.)   Jahn raised an age discrimination claim with the EEOC, but he did not assert race or gender discrimination claims.   The bases for Jahn's EEOC claim, and the "particulars" of that claim are shown below.

---

[2]      "[I]t is well-established that the exhaustion of administrative remedies is not a pleading requirement but an affirmative defense." *Fennell v. AARP*, 770 F. Supp. 2d 118, 126 (D.D.C. 2011).

| DISCRIMINATION BASED ON | DATE(S) DISCRIMINATION TOOK PLACE | |
|---|---|---|
| | Earliest | Latest |
| Age, Retaliation | 11/01/2021 | 02/14/2022 |

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

I began working for the above-named employer on or about June 27, 2016, as an Academic Success Coach. On or about November 11, 2021, I received a disciplinary action for alleged violation of the Family Educational Rights and Privacy Act of 1974 (FERP). My employer had no policy defining access to employees or disclosure of information or which employees had a legitimate educational purpose in accessing the student information. I disputed the written reprimand and informed BMCC that I would be reporting myself to FERPA in an effort to have this issue clarified. I received a response from the Student Privacy Policy Office but not until April 2022. Their response included, "There is no basis under FERPA to require that a school take punitive or disciplinary action against an individual school official as a result of a FERPA violation." On or about February 10, 2022, I received a 5-day suspension for alleged insubordination in part because I continued to dispute the validity of the written reprimand that I had received related to FERPA. In or about February 14, 2022, after notifying the President, in writing, that I would be appealing this as per BMCC policy he abruptly sent me an email informing me that I was terminated. I believe I was discriminated against because of my age, (62), and retaliated against for engaging in a protected activity, in violation of the Age Discrimination in Employment Act of 1967, as amended.

(ECF No. 1-2, PageID.47.)

Jahn signed this EEOC complaint, declaring under penalty of perjury that the statement was true and correct.    (*Id.*)

The EEOC provided Jahn with a notice of his right to sue on September 13, 2022.   (ECF No. 1-1, PageID.44.)   The notice gave no indication of the scope of the EEOC's inquiry into Jahn's claims.

The last sentence of the "particulars" section in Jahn's EEOC claim demonstrates that Jahn raised only age discrimination and retaliation claims in his EEOC charge.   In the undersigned's opinion, Jahn's EEOC complaint was not sufficient to exhaust his gender and race discrimination claims.   "Courts have expanded upon the charge filing requirement . . . to provide that a party's discrimination claim in the District Court may include claims 'limited to the scope of the EEOC investigation reasonably expected to grow out of the charge of discrimination.'" *Davis v. Sodexho, Cumberland Coll. Cafeteria*, 157 F.3d 460, 463 (6th Cir. 1998) (quoting *EEOC v. McCall Printing Corp.,* 633 F.2d 1232, 1235 (6th

Cir.1980).   As shown above, Jahn did not raise gender or race discrimination charges in his EEOC complaint, and his charge presents no facts which could allow the Court to determine that gender or race discrimination claims could relate to or grow out of the actual charge filed with the EEOC.   Thus, Jahn's gender and race discrimination claims were not exhausted in his EEOC complaint.

Jahn recognizes that his EEOC charges did not include gender and race discrimination, but he argues that was not his fault.   (ECF No. 12, PageID.107) Jahn says that it was his intention to file gender and race discrimination charges, but the EEOC would not include those charges despite his pleas otherwise.   (*Id.*) Jahn had the opportunity to amend his EEOC complaint either before completion of the EEOC's investigation, or, with the permission of an Administrative Law Judge, after completion of the investigation.   29 C.F.R. § 1614.106(d); *see also Jones v. Johnson*, 707 F. App'x 321, *4 (6th Cir. 2017) (noting that a complainant may amend the EEOC complaint at any time before the completion of the investigation).   The records before the Court give no indication that Jahn amended his complaint to the EEOC.   And Jahn's EEOC charges did not include gender and race discrimination. *Jones v. Johnson*, 707 F. App'x 321, *4 (6th Cir. 2017) (a complainant may amend the EEOC complaint at any time before the completion of the investigation).

In the opinion of the undersigned, Jahn failed to exhaust his gender and race claims and so those claims are subject to dismissal.

## VI.    Retaliation (Count II)

Jahn asserts that his termination violated Title VII because it was retaliatory. To establish a prima facie case of unlawful retaliation under Title VII, plaintiffs must show that: (1) they engaged in activity protected under Title VII; (2) defendants were aware of this activity; (3) after engaging in protected activity, they faced an adverse action by defendants; and (4) there was a causal connection between the protected activity and the adverse action.    *Rogers v. Henry Ford Health Sys.*, 897 F.3d 763, 775 (6th Cir. 2018) (citing *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014)). At this stage, Jahn does not have to establish all the elements of a prima facie case of retaliation to avoid dismissal; Jahn must only state a facially plausible claim for relief.    *Fisher v. Mich. Dep't of Corr.*, No. 1:20-CV-302, 2021 WL 5507874, at *5 (W.D. Mich. Aug. 12, 2021) (citing *Crowder v. Railcrew Xpress*, 557 F. App'x 487, 492-93 (6th Cir. 2014)).

In the undersigned's opinion, Jahn's factual allegations miss the mark on the first element of his Title VII retaliation claim.    Although Jahn alleges that he engaged in protected activity, he does not sufficiently allege that he engaged in activity protected *under Title VII*.

Count II of Jahn's complaint alleges discrimination and retaliation under Title VII, as shown below.

26

COUNT II

DISCRIMINATION

RETALIATION

TITLE VII - 42 U.S.C. § 2000e et seq.

104. Plaintiff realleges and reaffirms the above paragraphs with the same force and effect as if set forth herein.

Defendant Bay Mills Community College, through their employees, agents, managers, and/ or assigns, discriminated and/or retaliated against Plaintiff by terminating Plaintiff's employment at Bay Mills Community College in whole or in part because of Plaintiff having complained of and/or opposed practices in violation of Title VII of the Civil Rights Act of 1964 and reported violations.

105. Defendant Bay Mills Community College, through its employees, agents, managers, and/or assigns, retaliated against Plaintiff because Plaintiff made a charge, assisted, and participated in any manner in an investigation under 42 U.S.C. § 2000e.

Defendant Bay Mills Community College's participation in the aforementioned actions, activities and/or practices, was both discriminatory and retaliatory.

(ECF No. 1, PageID.37-38.)

Title VII makes it unlawful for an employer to discriminate against individuals based on "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). But Jahn's complaint indicates that his prior protected activity concerned complaints regarding financial aid violations, or student conduct, and were not based upon race, color, religion, sex, or national origin discrimination. Jahn set forth the basis of his retaliation claim in Paragraphs 93 and 94 of his complaint, which are shown below.

93. On February 8, 2022, Plaintiff wrote to Bedell, informing him that McLeod does not want to receive any more emails related to financial aid fraud which had been shared on February 2nd. Other issues were addressed as well and Plaintiff reasserted that he felt his supervisors were harassing and retaliating against him because he objected to the invalid FERPA discipline and took steps to have other issues acknowledged-if not actually investigated. Plaintiff had complained about his supervisors and had no idea if any actions had been taken by Bedell.

94. On February 10, at 7:45 am, Plaintiff was sent an email from McLeod taking away an assigned student (Student GB) from his advising responsibility. Plaintiff responded with a lenthy email that started with, *"Thank you for putting her preferences in writing because all of the recent changes were confusing and not clearly communicated."* This particular matter involved Bedell's stepdaughter, Assistant Registrar Heather Church (hereinafter, "Church"). She had been complaining about error she believed Plaintiff made in doing a degree audit for graduation on a student. Student GB was assigned to Plaintiff in TRiO his program of study was in the program that Church chaired. Plaintiff continued to express frustration and noted; *"I reported concerns about possible financial aid fraud to you on 11/3/21. Eight days later I was falsely accused and received formal discipline for an invalid 'FERPA' violation."* Plaintiff went on to list the names of administrators he had communicated with over the five

years of his employment at BMCC. Plaintiff wrote, *"When you deny or wish to ignore reports of concerns from a subordinate, and single me out and prohibit me from communicating with you about news and current events – which clearly pertain to the job – this looks like retaliation and I'll seek whistleblower protection.*

(ECF No. 1, PageID.33-34.)

Jahn's complaint asserts that his harassment, discipline, and termination of employment were retaliation carried out because of his whistleblowing about financial aid concerns. As such, Jahn's complaint does not state a plausible claim for relief under Title VII. The undersigned therefore recommends that the Court grant the motion to dismiss with respect to Jahn's Title VII retaliation claim.

## VII.    State Law Claims (Counts IV and V)

Two counts in Jahn's complaint raise claims under Michigan's Elliot-Larsen Civil Rights Act, Mich. Comp. Laws § 37.2101 *et seq*.   In determining whether to retain supplemental jurisdiction over state law claims, "[a] district court should consider the interests of judicial economy and the avoidance of multiplicity of litigation and balance those interests against needlessly deciding state law issues." *Landefeld v. Marion Gen. Hosp., Inc.*, 994 F.2d 1178, 1182 (6th Cir. 1993). Ordinarily, when a district court has exercised jurisdiction over a state-law claim solely by virtue of supplemental jurisdiction and the federal claims are dismissed prior to trial, the court will dismiss the remaining state-law claims. *Id*.   Dismissal, however, remains "purely discretionary." *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009) (citing 28 U.S.C. § 1367(c)); *Orton v. Johnny's Lunch Franchise, LLC*, 668 F.3d 843, 850 (6th Cir. 2012).

If the Court adopts the undersigned's recommendation, it will dismiss each of Jahn's federal claims.   The balance of the relevant considerations would therefore weigh against the exercise of supplemental jurisdiction.   As such, it is respectfully recommended that the Court decline to exercise supplemental jurisdiction.

## VIII.    Recommendation

It is respectfully recommended that the Court grant Defendant's motion to dismiss because the complaint does not state plausible claims of Title VII gender, race, or age discrimination.   It is further recommended that the Court decline to

exercise supplemental jurisdiction over Jahn's Michigan Elliot-Larsen Civil Rights Act claims.

NOTICE TO PARTIES:   Objections to this Report and Recommendation must be served on opposing parties and filed with the Clerk of the Court within fourteen (14) days of receipt of this Report and Recommendation.   28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b); W.D. Mich. LCivR 72.3(b).   Failure to file timely objections constitutes a waiver of any further right to appeal.   *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).   *See also Thomas v. Arn*, 474 U.S. 140 (1985).

Dated:     August 7, 2023                              /s/ *Maarten Vermaat*
                                                        MAARTEN VERMAAT
                                                        U.S. MAGISTRATE JUDGE

30